IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 1:21-CR-241 |
| v. | The Hon. Rossie D. Alston, Jr. |
| AHMAD TAREQ RASULI, | Sentencing: February 16, 2022 |
| *Defendant.* | |

## **GOVERNMENT'S POSITION ON SENTENCING**

The defendant, Ahmad Tareq Rasuli, comes before the Court for sentencing, having pleaded guilty to his role in distributing powdered fentanyl in the Commonwealth of Virginia, and for possessing a firearm and ammunition while being a user of controlled substances.

The United States has reviewed the Presentence Investigation Report (PSR), ECF No. 37, and has no objections to the Probation Officer's calculation of the defendant's advisory guidelines, as set forth in paragraphs 30-41 and Part D.  For the reasons provided herein—specifically, the gravity of the defendant's offense, including his repeated distributions of deadly powdered fentanyl, his prior criminal record, the defendant's knowledge of the dangers of the fentanyl he was distributing, and the fact that the defendant possessed multiple firearms and ammunition while being a drug user and dealer of fentanyl, a sentence at the high end of the guidelines is appropriate in this case. The government submits that a sentence of 71 months' imprisonment, which represents the high end of the guidelines range, is sufficient but not greater than necessary to fulfill the purposes of sentencing in this case.

## BACKGROUND

I. _The investigation into the defendant_

In June of 2020 detectives with the Prince William County Police Department began an operation targeting the defendant, whom they had learned from various sources was a drug dealer. Law enforcement initially believed the defendant to be selling heroin, but it was later learned the defendant was dealing powdered fentanyl.   On June 25, 2020, law enforcement utilized a Confidential Source (CS-1) to introduce undercover officer (UC-1) to the defendant and to conduct a controlled purchase of powdered fentanyl from the defendant.  During that initial purchase, the defendant sold approximately 3.5 grams of fentanyl to CS-1 in exchange for $380.  After the introduction to UC-1, the defendant communicated directly with CS-1 and regularly sold fentanyl to CS-1.  On eleven separate occasions following the initial purchase, the defendant met with and personally sold powdered fentanyl to UC-1 at various locations in Northern Virginia.  On several of those occasions, law enforcement officers conducting surveillance of the controlled purchases observed that the defendant conducted multiple other suspected narcotics transactions with other unknown individuals before and after distributing fentanyl to UC-1.

During the twelfth controlled purchase that occurred on September 23, 2020, UC-1 purchased approximately 14 grams of fentanyl from the defendant. During that controlled purchase, the defendant spoke with UC-1 about the fentanyl he had just sold to UC-1, and the defendant's statement revealed he was not just generally aware of the deadly nature of the fentanyl he was selling, but he had personally had to save others who had overdosed from his product. During that controlled purchase the defendant stated to UC-1 that the product he was providing was stronger than what he had been selling previously and he informed UC-1 that he (the

2

defendant) had to use NARCAN on several of his customers who had used some of his new batch of fentanyl.

The weight of fentanyl purchased from the defendant on any one occasion ranged from four grams to fourteen grams, and the defendant sold fourteen grams (equating to one half ounce) of fentanyl to UC-1 on four separate occasions. PSR ¶¶ 16. In total the weight of fentanyl purchased directly from the defendant during the twelve controlled purchases conducted in the three month period between June 2020 and August 2020 was approximately 108.5 grams.

The investigation revealed that the defendant was travelling to Baltimore, Maryland several times per week.  In Baltimore, the defendant would obtain larger quantities of powdered fentanyl that he would then transport back to Virginia.  Once in Virginia, the defendant would break down the larger quantity of fentanyl powder and repackage it for resale. The defendant then sold the repackaged fentanyl to his customers, making a profit off of the sales.

In addition to personally distributing fentanyl to UC-1 on twelve occasions, the defendant also directed another individual to distribute fentanyl to UC-1 on his behalf.  On October 14, 2020, the defendant arranged for another individual to sell UC-1 an additional quantity of eight grams of fentanyl at a location just down the street from the residence that the defendant was living in at that time.  Additionally, during the time period of June 2020 to October 2020, the defendant worked with that same individual, as well as others, to distribute his fentanyl and the defendant would compensate those individuals for distributing or delivering his fentanyl to customers.

During this time period the defendant was also a user of controlled substances, and he possessed multiple firearms and ammunition for those firearms while being a user of drugs.  A search warrant executed on the defendant's residence and vehicle in October of 2020 led to the discovery of 14.9 grams of fentanyl, three shotguns with accompanying ammunition, three loaded

pistol magazines, and various types of other firearm ammunition.  During the execution of that search warrant, the defendant returned to the residence and upon seeing law enforcement he and two other individuals, including a co-conspirator who had sold the defendant's fentanyl to UC-1 on October 14, 2020, attempted to flee the area in a vehicle.  The defendant along with the two other individuals were apprehended after a traffic stop was conducted on the vehicle.  Law enforcement located another 21.8 grams of fentanyl belonging to the defendant, and discovered the defendant had a small amount of heroin stashed in his underwear.

II.     *The Defendant's Procedural History*

The defendant was initially charged with state offenses in Prince William County, Virginia on October 28, 2020.  PSR ¶ 55.  On April 8, 2021, the defendant was charged in the Eastern District of Virginia by criminal complaint, in case number 1:21-mj-116, and an arrest warrant was issued for the defendant's arrest.  ECF Nos. 1, 7.  The defendant was arrested in the Middle District of Florida on July 12, 2021.  PSR ¶ 1.  The defendant was then extradited to the Eastern District of Virginia and made his initial appearance in this District on August 24, 2021. ECF No. 11.  On August 26, 2021, the defendant waived his right to a preliminary hearing, and on August 30, 2021, the defendant was ordered to be held in detention pending resolution of the case.  ECF Nos. 16, 19.  On November 5, 2021, the defendant pleaded guilty to a two count criminal information, pursuant to a written plea agreement, charging the defendant with: Count 1: conspiracy to distribute 40 grams or more of a mixture and substance containing fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and Count 2: possession of a firearm and ammunition by a prohibited person , in violation of 18 U.S.C § 922(g)(3).  ECF Nos. 30-31, 33-34.  On November 5, 2021, this Court entered a Consent Order of Forfeiture, in which the defendant agreed to forfeit the proceeds the defendant obtained as a result of the sales of fentanyl to UC-1, as well as the firearms

4

and ammunition seized during the execution of the search warrant on the defendant's residence and vehicle. ECF No. 35.

<b>SENTENCING ANALYSIS</b>

*I.*     <u>Law</u>

The Court consults both the Sentencing Guidelines and the sentencing factors in 18 U.S.C. § 3553(a) to determine a defendant's appropriate sentence. Although the Sentencing Guidelines are advisory, district courts are required to "consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 264 (2005). Under the required procedures, a "district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).

Section 3553(a) requires district courts to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." Paragraph 2 lists four purposes for a sentence: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). In addition to the purposes of sentencing listed in Section 3553(a)(2), a sentencing court must also consider: (1) the nature of the offense and the defendant's history and characteristics; (2) the kinds of sentences legally available; (3) the advisory sentencing range provided by the Sentencing Guidelines; (4)

5

any relevant policy statement issued by the Sentencing Commission; (5) the need to avoid unwarranted sentence disparities; and (6) the need for restitution.  18 U.S.C. § 3553(a).

II.      _Guidelines Calculation and Motion for Upward Departure_

The calculated offense level, as in most drug cases, is driven by the drug weight.  Here, the parties have stipulated that the base offense level is 24, because the defendant is attributed with between 40 grams and 160 grams of fentanyl.  PSR ¶¶ 4, 23, 32.  There is a two-point enhancement pursuant to Section 2D1.1(b)(1) because a dangerous weapon was possessed by the defendant.  PSR ¶ 33.  There are no enhancements or reductions based on the defendant's role in the offense.  PSR ¶ 35.  The government concurs with the Probation Officer's application of the two-level reduction for acceptance of responsibility under § 3E.1.(a).   PSR ¶ 39.  Accordingly, the government hereby moves for an additional one-level reduction under § 3E1.1(b), which the Probation Officer has already calculated in the guidelines calculations.  PSR ¶ 40.  The resulting total offense level is therefore 23.  PSR ¶¶ 41, 80.

The defendant's 2016 and 2020 convictions for possession of marijuana, and his 2017 conviction for misdemeanor possession of a controlled substance (which was related to an attempted controlled purchase of cocaine by law enforcement from the defendant) result in three criminal history points.  PSR ¶¶ 3, 45-46.  The defendant properly receives two additional criminal history points because he was under a term of probation when he committed the instant offense.  PSR ¶ 49.  Therefore, the defendant receives a total criminal history score of five, and that establishes a criminal history category of III.  PSR ¶¶ 49-50, 80-81.

According to the United States Sentencing Commission Sentencing Table, an offense level of 23 and criminal history category III would yield a guidelines range of 57-71 months; however, the defendant's low end of the guidelines range is restricted to 60 months by the statutory

mandatory minimum of five years required to be imposed in Count 1.  *See,* PSR ¶ 81.  The resulting guidelines range is therefore 60-71 months.  PSR ¶ 81.

III.        *Sentencing Analysis*

The deadly fentanyl that the defendant was distributing in Northern Virginia has devastated communities throughout the United States.  The toll that fentanyl is having on the country, and on Virginia, is common knowledge and often the subject of news reports and headlines.   The devastating impact of this opioid epidemic in the United States has been clearly evident in the Commonwealth of Virginia.   In Virginia in 2013, there were 134 overdose deaths attributed to fentanyl.  Va. Dept. of Health, Office of the Chief Medical Examiner, Fatal Drug Overdose Quarterly Report 3rd Quarter 2021, p.36, *available at* https://www.vdh.virginia.gov/content/uploads/sites/18/2022/01/Quarterly-Drug-Death-Report-FINAL-Q3-2021.pdf.  Since 2013, the number of fatal overdose deaths caused by fentanyl has dramatically increased, and since 2016 fentanyl has been the leading cause of fatal overdoses in Virginia. *Id.*   In 2016, the number of overdose deaths caused by fentanyl had jumped to 622, and by 2017, the number of overdose deaths jumped to 769. *Id.*

Comparison of the number of fatal overdose deaths in Virginia cause by fentanyl, to deaths caused by heroin, illustrates just how much more dangerous fentanyl is than any other opioid.  It also clearly puts into perspective the devastating impact fentanyl is having on the communities of Virginia.  Between 2017 and 2019, the number of overdose deaths caused by heroin stayed steady with just under 560 deaths for each of those three years.  *Id.*  In contrast, between 2017 and 2019, fentanyl overdose deaths rapidly increased in number from year to year, with 769 deaths in 2017, 813 deaths in 2018, and 964 deaths in 2019.  *Id.*  In 2020 and 2021, the number of deaths caused by heroin overdoses decreased, with 518 deaths in 2020, and 437 deaths in 2021.  In stark contrast,

2020 and 2021 saw the number of fentanyl overdose deaths skyrocket in Virginia, jumping to 1,659 deaths in 2020, and 2,042 deaths in 2021. *Id.*

The defendant was a profiteer of this fentanyl crisis, the damage of which has been widely reported and is commonly known. Anyone would be on notice from the general publicity of the fentanyl epidemic that the fentanyl that the defendant was profiting off of is highly lethal. Perhaps most disturbing about this case is that the defendant was without a doubt personally aware that the fentanyl he was distributing was lethal. The defendant's own statements make it impossible to deny that he had direct knowledge of the deadly nature of the fentanyl that he continued to distribute into the community. During the controlled purchase on September 23, 2020, as the defendant was selling fourteen more grams of fentanyl from his latest batch to UC-1, the defendant told the undercover officer that he had already had to use NARCAN to save the lives of several people who had overdosed on his latest and stronger batch of fentanyl. The defendant did not care that he had recently caused people to overdose on the new and deadlier batch of fentanyl, and he was not concerned about causing more overdoses. The defendant was only concerned about turning a profit, and he continued to deal fentanyl he knew had caused overdoses into the community. His reckless and potentially lethal activity only ceased because he was arrested on October 28, 2020.

The sentence imposed should reflect the unquestionable seriousness of the offense and the significant and clearly known danger created by the defendant's conduct of distributing deadly poison to his customers. The sentence should take into account the fact that the defendant was on notice that the fentanyl he had distributed had caused several individuals to overdose already, and that fact didn't in any way discourage the defendant from selling the same fentanyl to others and taking the risk that they could suffer a fatal overdose. The sentence should also take into

8

consideration that the defendant involved others in his drug distribution activities and the defendant had at least two other individuals distribute and deliver fentanyl on his behalf. PSR ¶ 14,18. The defendant pulling others into the distribution of fentanyl is not taken into account by the guidelines, but such behavior supports the imposition of a sentence at the high end of the guidelines. Lastly, the sentence should reflect that the defendant possessed multiple firearms, pistol magazines filled with ammunition, and loose ammunition, all while being a drug user as well as a drug dealer. While the government acknowledges that the guidelines do account for the defendant having a firearm (two offense level points added because a dangerous weapon was possessed as documented at PSR ¶ 33), the dangerous combination of drug dealing, drug using, and firearms warrants a sentence at the high end of the sentencing guidelines range. If a sentence of only 60 months (which represent the mandatory minimum sentence in Count I and low end of the guidelines range) were imposed in this case, this defendant would be sentenced no differently than any other person who has been convicted of a single count of distributing 40 grams or more of fentanyl. A sixty month sentence would ignore the fact that the defendant has also been convicted of Count 2 for illegally possessing firearms, and thus such a sentence would result in a sentencing disparity with like situated defendants.

The defendant has clearly battled with substance abuse issues in his life, and treatment is clearly needed as the defendant suffers from sever substance abuse issues, as well as mental health issues. PSR ¶¶ 63-65. However, the defendant has previously been put on notice that his substance abuse issues were a problem, as he has been three times previously convicted drug offenses. PSR ¶¶ 43 ,45-46. Despite those prior drug convictions, the defendant chose to not only return to drug use and drug dealing, but to escalate his behavior by dealing a much more dangerous drug and dealing large quantities of fentanyl. As previously noted, the defendant does appear to be in need

9

of substance abuse treatment, and the government acknowledges that he began taking steps toward addressing his issue with substance abuse while on pretrial supervision. PSR ¶ 66. The government hopes the defendant continues to address his substance abuse and mental health issues while in custody, and upon his release from custody.

However, the defendant's distribution of deadly fentanyl was not solely due to the defendant's substance abuse or mental health issues. This defendant was not an individual who was a hopeless addict, buying small personal use amounts and selling even smaller portions of that personal use stash solely to feed his addiction. This is also not a case of an addict who was sharing his personal drug supply with others without receiving monetary compensation. The defendant was a dealer who travelled multiple times per week to Baltimore, Maryland to obtain large amounts of fentanyl powder that he transported back to Virginia. The Defendant didn't "just" sell small amounts of fentanyl to make enough money to support his own habit. Rather, based upon the quantities of fentanyl purchased during the controlled purchases conducted by law enforcement, the defendant was selling at least one-half-ounce (14 grams) quantities of fentanyl powder at a time. Sales of that amount of fentanyl are proof that the defendant was dealer of fentanyl for profit, not an addict driven only by his addiction.

The defendant knew the the deadly risks associated with what he was doing, and even after acknowledging that he had caused others to overdose, he nonchalantly ignored those risks in order to continue making money. The defendant was willing to risk the lives of other so that he could turn a profit selling one of the deadliest drugs this country has ever encountered. A sentence at the high end of the guidelines would serve a strong specific deterrent to the defendant individually, as well as send a clear message that will act as a general deterrent to others who may consider selling deadly fentanyl.

## CONCLUSION

The defendant chose to take the risk of selling deadly fentanyl to his customers so that he could make a profit, and he personally distributed over 100 grams of fentanyl to a single undercover law enforcement officer in only a three-month period.  Furthermore, he involved others in his distribution activities, and possessed firearms while using drugs and being a drug dealer. For the reasons stated herein, the United States submits that a sentence of imprisonment of 71 months is sufficient but not greater than necessary to satisfy the sentencing factors in Section 3553(a).

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:      _____/s/_____

Ryan B. Bredemeier
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2022, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record in this matter. I further certify that I will forward an electronic copy of the foregoing to the United States Probation Officer assigned to the case.

/s/
Ryan B. Bredemeier
Assistant United States Attorney
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: (703) 299-3700
Fax: (703) 299-3982
ryan.bredemeier@usdoj.gov

12